Reid A. Winthrop (SBN 223527)
Henry Harmeling IV (SBN 207673)
**WINTHROP LAW GROUP, P.C.**
120 Newport Center Dr.
Newport Beach, California 92660
Phone:  949-269-3256 | Fax:  949-432-3526
reid@winthroplawgroup.com
henry@winthroplawgroup.com

Attorneys for Selena Scola

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CODY BARNES, professionally known as LEXI LOVE,<br><br>Plaintiff,<br><br>vs.<br><br>SELENA SCOLA,<br><br>Defendant.<br><br>———————————————<br><br>SELENA SCOLA, aka LEXI LOVE,<br><br>Counter-Plaintiff,<br><br>vs.<br><br>CODY BARNES, an individual; PARAMOUNT SKYDANCE CORPORATION, a Delaware corporation; and WORLD OF WONDER PRODUCTIONS, INC., a California corporation,<br><br>Counter-Defendants. | CASE NO. 3:25-cv-10837-RS<br><br>**DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:        Hon. Richard Seeborg<br>Hearing Date: April 16, 2026<br>Time:         1:30 p.m.<br>Ctrm:         3 – 17TH Floor<br><br>Complaint filed:    December 19, 2025<br>Counterclaims filed:    March 9, 2026 |

i

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on April 16, 2026, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the above-entitled Court, located at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Defendant and Counter-Plaintiff Selena Scola will and hereby does move this Court for a Preliminary Injunction enjoining Plaintiff Cody Barnes ("Barnes") and Third-Party Defendants Paramount Skydance Corporation ("Paramount") and World of Wonder Productions, Inc. ("WOW") from continuing to use and promote the mark LEXI LOVE in connection with Barnes's performances, marketing, advertising, and related commercial activities.

This motion is made pursuant to Federal Rule of Civil Procedure 65(a), the Lanham Act, 15 U.S.C. § 1116, and the Court's inherent equitable authority.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction, the Declaration of Selena Scola, the Request for Judicial Notice, all pleadings and papers on file in this action, and such further argument and evidence as may be presented to the Court.

WINTHROP LAW GROUP, P.C.

Dated: March 09, 2026                    */s/ Reid A. Winthrop*

Reid A. Winthrop
Attorney for Selena Scola

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ................................................... 2

III. LEGAL STANDARD ................................................................................................... 5

IV. ANALYSIS ................................................................................................................... 5

    A. Scola Is Substantially Likely to Succeed on the Merits of Each of Her Claims................ 5

        a. Scola Is Substantially Likely to Prove that Barnes Directly Infringes on Her Trademark. ...................................................................................................... 5

            i. Scola Has a Valid, Enforceable Trademark.............................................. 5

            ii. Scola's Mark Is Confused with Barnes's Work as Lexi Love................... 9

                1. Strength of the Mark ...................................................................... 10

                2. Proximity of the Goods .................................................................. 12

            iii. Similarity of the Marks ........................................................................... 13

                1. Evidence of Actual Confusion ....................................................... 13

                2. Marketing Channels Used............................................................... 13

                3. Types of Goods and the Degree of Care Likely to Be Exercised by Purchaser.................................................................................... 14

                4. Barnes's Intent in Selecting the Mark........................................... 15

                5. Likelihood of Expansion of Services ............................................ 16

         b. Scola Is Substantially Likely to Succeed on the Merits of Her Contributory Trademark Infringement Claim Against Paramount and WOW. ............................... 16

        c. Scola Is Substantially Likely to Succeed on the Merits of Her Conversion Claim.............................................................................................................. 18

        d. Scola Is Substantially Likely to Succeed on the Merits of Her Unfair Competition Claim................................................................................................. 19

    B. Scola Will Suffer Irreparable Harm Absent an Injunction............................................. 20

    C. The Balance of the Harms Significantly Favor Scola..................................................... 22

    D. The Public's Interest Is Not Disfavored by Enjoining the Infringement of a Protected Trademark. ...................................................................................................... 22

V. CONCLUSION.............................................................................................................. 23

**TABLE OF AUTHORITIES**

**Cases**

*Acosta Roa Official Fulfilling Duties of Field Office Director*,
 No. 25-CV-07802, 2025 WL 2637565 (N.D. Cal. Sept. 12, 2025)..........................................5

*Amazon.com v. Pionera Inc.*,
 No. 22-CV-01491, 2023 WL 4424649 (E.D. Cal. July 10, 2023)...........................................15

*AMF Inc. v. Sleekcraft Boats*,
 599 F.2d 341 (9th Cir. 1979)............................................................................................ 13, 14

*Apple Comput., Inc. v. Formula Int'l Inc.*,
 725 F.2d 521 (9th Cir. 1984).................................................................................................. 20

*Applied Info. Scis. Corp. v. eBAY, Inc.*,
 511 F.3d 966 (9th Cir. 2007)....................................................................................................5

*AT&T Corp. v. Vision One SecuritySys.*,
 No. 95-CV-0565, 1995 WL 476251 (S.D. Cal. July 27, 1995)...............................................23

*Blue v. Johnson*,
 No. 07-CV-05370, 2008 WL 2024995 (N.D. Cal. May 9, 2008) ....................................... 7, 12

*Blumenthal Dist., Inc. v. Comoch Inc.*,
 652 F. Supp. 3d 1117 (C.D. Cal. 2023).................................................................................. 23

*Boldface Licensing %8F Branding v. By Lee Tillett, Inc.*,
 940 F. Supp. 2d 1178 (C.D. Cal. 2013).................................................................................. 22

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
 174 F.3d 1036 (9th Cir. 1999)..................................................................... 5, 6, 12, 14, 23

*Cash v. Interscope Geffen A&M Records*,
 No. 22-CV-01900, 2024 WL 3914517 (C.D. Cal. July 22, 2024) ........................................ 6, 7

*Century 21 Real Estate Corp. v. Sandlin*,
 846 F.2d 1175 (9th Cir. 1988) ..................................................................................................5

*Coach, Inc. v. Goodfellow*,
 717 F.3d 498 (6th Cir. 2013)................................................................................................... 18

*Cohn v. Petsmart, Inc.*,
 281 F.3d 837 (9th Cir. 2002).................................................................................................. 10

*English & Sons, Inc. v. Straw Hat Rests., Inc.*,
 176 F. Supp. 3d 904 ................................................................................................................ 18

*Fizz Social Corp. v. Maplebear, Inc.*,
 791 F. Supp. 3d 990 (N.D. Cal. 2025) .............................................................................. 14, 15

*Friends of the Wild Swan v. Weber*,
 767 F.3d 936 (9th Cir. 2014)....................................................................................................5

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Google LLC v. Sonos, Inc.*,
No. 20-CV-06754, 2022 WL 195850 (N.D. Cal. Jan. 21, 2022) .......................................... 19

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) ...................................................................................... 13, 15

*Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1031 (C.D. Cal.
2011)* ....................................................................................................................................... 19

*Ironhawk Techs, Inc. v. Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021) ........................................................................................... 9, 15

*Levi Strauss v. Blue Bell, Inc.*,
778 F.2d 1352 (9th Cir. 1985) ................................................................................................ 6

*Lockheed Martin Corp. v. Network Sols., Inc.*,
194 F.3d 980 (9th Cir. 1999) ............................................................................................... 17

*Longo v. Longo*,
No. 20-CV-00829, 2020 WL 7774925 (C.D. Cal. Nov. 12, 2020) ......................................... 19

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005) ......................................................................................... 9, 10

*Marketquest Grp., Inc. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017) ............................................................................................... 15

*Masters Software, Inc. v. Discovery Commc'ns, Inc.*,
725 F. Supp. 2d 1294 (W.D. Wash. 2010)........................................................................ 20, 23

*Maxim Integrated Prods., Inc. v. Quintana*,
654 F. Supp. 2d 1024 (N.D. Cal. 2009) ................................................................................ 20

*Microsoft Corp. v. My Choice Software, LLC, No. 16-CV-2187, 2017 WL
5643210, at \*6 (C.D. Cal. Oct. 10, 2017)*............................................................................. 20

*New W. Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979)*.............................. 19

*Opticians Ass'n of Am. V. Indep. Opticians of Am.*,
920 F.2d 187 (3d Cir. 1990) ................................................................................................. 20

*Paul Frank Indus., Inc. v. Sunich*,
502 F. Supp. 2d 1094 (C.D. Cal. 2007)................................................................................... 6

*Perfect 10, Inc. v. Via Intern. Serv. Ass'n*,
494 F.3d 788 (9th Cir. 2007) ............................................................................................... 17

*Plough, Inc. v. Kreis Lab'ys*,
314 F.2d 635 (9th Cir. 1963) ............................................................................................... 13

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ............................................................................................. 10

*Protiviti Inc. v. Protiviti, LLC*,
No. 23-CV-08442, 2024 WL 2967321 (C.D. Cal. June 12, 2024)........................................... 18

iii

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ................................................................... 12

*Sengoku Works Ltd. v. RMC Intern., Ltd.*,
    96 F.3d 1217 (9th Cir. 1996) ...................................................................... 6

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ......................................................9, 10, 11, 12

*Swingless Golf Club Corp. v. Taylor*,
    732 F. Supp. 2d 899 (N.D. Cal. 2010) ...................................................... 18

*Talent Mobile Dev., Inc. v. Headios Grp.*,
    No. 16-CV-0464, 2017 WL 6940548 (C.D. Cal. Oct. 3, 2017) ................. 15

*Walter v. Mattel, Inc.*,
    210 F.3d 1108 (9th Cir. 2000) .................................................................. 10

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .................................................................... 5

*Y.Y.G.M. SA v. Redbubble, Inc.*,
    75 F.4th 995 (9th Cir. 2023) .................................................................... 18

*YZ Prods., Inc. v. Redbubble, Inc.*,
    545 F. Supp. 3d 756 (N.D. Cal. 2021) ...................................................... 17

**Statutes**

15 U.S.C. § 1116(a) ...................................................................................... 20

**Other Authorities**

@LexiLove, X (Dec. 4, 2024, 1:55 AM),
    https://x.com/LexiLove/status/1864579217146696010?s=20 ..................... 3

@lexilovets, *Lexi V. Love Sliding into the DMs Like…*, TIKTOK (July 19, 2021),
    https://www.tiktok.com/@lexilovets/video/6986742558034644229 ................ 3

@not_addictive, *Lexi Love Copyright Situation*, REDDIT (last accessed Feb. 25, 2026),
    https://www.reddit.com/r/RPDRDRAMA/comments/1mwoxw5/lexi_love_copyright_situation/ ........................................................................ 15, 16

@rockitsciencelabs, *Eric Sharp-Help Me*, YOUTUBE (June 6, 2013),
    https://www.youtube.com/watch?v=bmdKoaHNKKY ................................. 9

@Tericakes, *Ways to Support Lexi Love During this Crazy Copyright Situation*, REDDIT (last accessed Feb. 26, 2026),
    https://www.reddit.com/r/rupaulsdragrace/comments/1mxnad7/ways_to_support_lexi_love_during_this_crazy/ ................................... 21

Bernardo Sim, *Insta-Gag! See How Many IG Followers "Drag Race" Season 17's Queens Snatched*, OUT (Apr. 22, 2025),
    https://www.out.com/drag/rupauls-drag-race-season-17-queens-instagram-most-popular .........................................................................11

iv

Bob the Drag Queen, *Lexi from Drag Race Spills EVERYTHING*, YOUTUBE (Oct. 24, 2025), https://www.youtube.com/watch?v=pddkiI4D11g&t=119s ................................. 18

Brittany Andrews to Host Halloween Spooktacular at Webster Hall, AVN (Oct. 22, 2012 7:14 P.M.), https://avn.com/press/video/brittany-andrews-to-host-halloween-spooktacular-at-webster-hall-36063 .................................................................. 8

*Filmography and Screen Credits*, LEXI LOVE (last accessed Feb. 26, 2026), https://www.lexilove.com/actor ..................................................................................... 9

Jeremy Glass, *I Got Into Porn on a Dare. Here's How I Got Out*, THRILLIST (Mar. 3, 2016), https://www.thrillist.com/sex-dating/nation/how-to-get-out-of-porn ...................... 13

Katie Campione, *"RuPaul's Drag Race" Season 17 Holds Steady in Key Demos, Rakes in Biggest TV Share in Series History*, DEADLINE (Apr. 23, 2025), https://deadline.com/2025/04/rupauls-drag-race-season-17-ratings-mtv-1236375043/ ........................................................................................................10, 11

*Lexi Love Rolls into Action with MISTR to Serve Sexual Health Realness*, MISTR (May 9, 2025), https://www.globenewswire.com/news-release/2025/05/09/3078146/0/en/Lexi-Love-Rolls-into-Action-with-MISTR-to-Serve-Sexual-Health-Realness.html ................................................................... 13

*Lexi Love to Appear on Brooklyn College Radio Show "Sex and Politics"* Thursday, AVN (Nov. 13, 2013), https://avn.com/press/technology/lexi-love-to-appear-on-brooklyn-college-radio-show-sex-and-politics-thursday-51417) ...................... 8

*Lexi Love*, IMDB (last accessed Feb. 26, 2026), https://www.imdb.com/name/nm1328999/ ........................................................... 9

*Lexi Love*, IMDB (last accessed Feb. 26, 2026), imdb.com/title/tt3294732/fullcredits/?ref_=tt_cl_sm ........................................... 9

Maddy Morphosis, *Lexi Give It To Me Straight Ep 72*, YOUTUBE (Oct. 9, 2025), https://www.youtube.com/watch?v=mkRQ53I0Hfk&t=696s ................................... 3

morbidthoughts, *Lone Star Pornutopia 2009*, FLICKR (last accessed Feb. 25, 2026), https://www.flickr.com/photos/morbidthoughts/albums/72157622852567273/...................... 8

Why Won't You Date Me? with Nicole Byer, *Lexi Love on the Legal Battle Over Her Name*, YOUTUBE (Nov. 21, 2025), https://www.youtube.com/watch?v=x-fNwcY8jVU&t=56s.............................................................................................. 22

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Counter-Plaintiff Selena Scola ("Scola") brings this action to stop the unlawful infringement of her federally protected trademark LEXI LOVE (the "Mark"). For over two decades, Scola built and maintained a thriving career under the name Lexi Love, filing for federal trademark protection for the first time in 2008, with registered first use in 2004. Scola has continuously used her Mark professionally ever since. In 2024, Scola discovered that Plaintiff/Counter-Defendant Cody Barnes ("Barnes") has been brazenly infringing Scola's Mark. After the scope of Barnes's infringement was revealed by her appearance in a globally televised program, Scola immediately sent Barnes a cease and desist demand (followed by several more). Barnes responded by weaponizing her own fanbase against Scola, spreading deliberate misinformation designed to undermine the validity of Scola's long-standing Mark. Barnes then took the extraordinary step of filing this action, captioning it "professionally known as Lexi Love." Barnes continues to market herself and perform under Scola's rightful Mark.

Since 2024, Paramount and WOW have aided Barnes's infringement at every step by providing an international platform that broadcasts this infringement to audiences worldwide, day after day, for over a year. They have been repeatedly notified of Scola's rights. After initially complying, Paramount Skydance Corporation ("Paramount") and World of Wonder Productions, Inc. ("WOW"), in conjunction with Barnes, reverted to marketing and promoting Barnes, utilizing Scola's trademark name Lexi Love, both in a television series and a recently released documentary. They have been given repeated opportunities to cease their infringement, but they have not only refused, they continue with their intentional and knowing infringement of Scola's mark.

Scola is being harmed, and the Mark is being diminished, every day these counter-defendants continue to infringe on the Mark. Barnes's filing of this action, and her and the third-party defendants' continued infringement, makes one thing unmistakably clear: they will not respect Scola's rights unless and until the Court compels them to do so. Scola, therefore, respectfully requests that this Court enjoin Barnes, Paramount, and WOW from continuing to infringe on the mark, and from continuing to cause irreparable damage to the reputation Scola has

1

built up over the last 20-plus years.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Scola has had a career under the name Lexi Love for more than twenty years.[1] Her career began in 2004 in the adult entertainment industry, where Scola became one of the most well-recognized entertainers in the business. By 2009, searches for "Lexi Love" overwhelmingly returned results associated with Scola, including her social media pages. In 2010, Scola began seeking roles in independent media projects. She has since secured roles in films, television shows, commercials, video games, and music videos; performed as a recording and touring artist; and been hired as a spokesperson, a film and podcast producer, and a CEO. Since 2024, Scola has released a new album, been cast in a feature film, and acted in a Super Bowl LX commercial. (*See* Declaration of Selena Scola ("Scola Decl.") ¶¶ 2-4, 12-16, 30.)

Throughout her career, Scola has gone to great lengths to protect the rights to her name. She maintained federal registration for LEXI LOVE in International Class ("IC") 41 from July 29, 2008, through May 13, 2022. (See Request for Judicial Notice ("RJN"), Ex. 1 , LEXI LOVE, Reg. No. 3475773 (July 29, 2008); and Ex. 2 LEXI LOVE, Reg. No. 4843150 (Oct. 27, 2015).)[2] Throughout this period, Scola actively enforced her rights against infringing users. On May 13, 2022, Scola's federal registration lapsed, but she nevertheless continued to use the mark in commerce. Then, on February 10, 2024, Scola reapplied for federal registration of the mark in ICs 35 and 41. (RJN, Ex. 3 LEXI LOVE, Reg. No. 7727806 (Mar. 18, 2025).) The application was published for opposition in the Trademark Official Gazette on January 28, 2025, and a certificate of registration was issued on March 18, 2025. *Id.* The federal registration is currently active. (Scola Decl. ¶¶ 9–11, Ex. A.) At no time did Scola abandon her mark. (Scola Decl., ¶¶ 11-16.)

Barnes performs as a drag queen under the name Lexi Love. Although Barnes alleges that she has continuously used the name Lexi Love as her drag name since 2009 (ECF 1 at ¶ 13), publicly, Barnes describes her use of the name and her involvement in drag as intermittent and

---

[1] When discussing professional work she has done, Scola is exclusively referring to work she has done as Lexi Love.

[2] The application references a first in use date of 2004.

inconsistent at best. In a recent interview, Barnes described how she started performing drag under the name Lexi Love, but soon after changed it to Alexis Love. (See Maddy Morphosis, *Lexi Give It To Me Straight Ep 72* 11:52–12:10, YOUTUBE (Oct. 9, 2025), https://www.youtube.com/watch?v=mkRQ53I0Hfk&t=696s.) (Scola Decl. ¶ 35, Ex. F.) And although she describes this change as lasting for "a few pageants," Barnes advertised performances as Alexis Love in 2009, 2010, and 2013. (*Id.* at 12:07–12:10; Scola Decl., Ex. B.) Barnes eventually readopted the name Lexi Love, but then "stopped doing drag for a while;" when she returned, she came back as yet another variation of the name: Alexa Love. (Morphosis, *supra*, at 12:10–12:25.) Acknowledging her propensity for stage name changes, Barnes said: "I came back for a little bit and was like 'I'm Alexa, I'm Alexstacy, I'm Alexa . . . 1, 2, 3,' you know like I couldn't stop or help myself." (*Id.* at 12:23–12:32.) Barnes once again returned to Lexi Love, but, as recently as "right before the show," went by Lexi DVV Love and Lexi V. Love.[3] (*Id.* at 12:34–12:57.)

In December 2024, Barnes, who had by then apparently changed her stage name back to Lexi Love, was announced as a contestant on Season 17 of *RuPaul's Drag Race* ("*Drag Race*"), a popular reality television show on which drag queens compete for the title of "America's Next Drag Superstar." This announcement was the first time Scola had heard of Barnes. (Scola Decl. ¶¶ 18-19.)

The moment Scola became aware that Barnes was infringing on her mark, Scola acted. On December 4, 2024, she contacted *Drag Race* and Paramount's MTV to inform them of her trademark rights. (*See* @LexiLove, X (Dec. 4, 2024, 1:55 AM), https://x.com/LexiLove/status/1864579217146696010?s=20.) (Scola Decl. ¶ 36, Ex. G.). No party took corrective action. (Scola Decl. ¶ 20.) Barnes continued to use Scola's mark, and Paramount and WOW streamed the show on their platforms and advertised the show, including Barnes as Lexi Love, on their social media accounts.

---

[3] *See also* @lexilovets, *Lexi V. Love Sliding into the DMs Like…*, TIKTOK (July 19, 2021), https://www.tiktok.com/@lexilovets/video/6986742558034644229 (Scola Decl. ¶ 37, Ex. H.)

3

On August 1, 2025, Scola sent a cease and desist letter to Paramount in which she informed it of Scola's rights to LEXI LOVE and instructed it to stop using the name immediately. (Scola Decl., Ex. C.) Scola sent similar cease-and-desists to Barnes and WOW on August 2, 2025. (*Id.*) But the infringement continued, and in fact, Barnes retaliated and escalated her campaign to usurp the Mark. Barnes took to podcasts, YouTube channels, and social media to announce her plans to continue using the name and to encourage her fans to do the same. (Scola Decl. ¶ 26.)

True to her word, since *Drag Race*, Barnes has performed live, been a guest on podcasts and at events, appeared in an episode of a television mini-series, and continues to be active on social media, all as Lexi Love. Paramount and WOW, for their part, have continued to make available content featuring Barnes as Lexi Love. *Drag Race* remains available for streaming on their respective platforms. In April 2025, WOW posted an episode entitled *The Road to RuPaul's Drag Race Lexi Love*, and in November 2025, it posted *My Untucked Life–Lexi* featuring Barnes as Lexi. Paramount and WOW have also continued to post content featuring Barnes as Lexi Love on their social media pages. (Scola Decl. ¶ 27.)

Barnes, Paramount, and WOW's refusal to cease infringement forced Scola to protect her intellectual property by notifying third party venues, platforms, and accounts advertising and referring to Barnes of the illegal use of her mark. (Scola Decl. ¶ 28.) On December 19, 2025, Barnes retaliated against Scola by seeking a declaratory judgment proclaiming Barnes as the owner of LEXI LOVE and asserting claims against Scola for trademark infringement, unfair competition, intentional interference with prospective economic damage, and intentional interference with contractual relations. (*See* ECF 1.)

In conjunction with this Motion, Scola brings a Counter Complaint against Barnes for trademark infringement, conversion, and unfair competition, and a Third-Party Complaint against Paramount and WOW for trademark infringement.

### III.    LEGAL STANDARD

The legal standards for preliminary injunctions and TROs are "substantially identical." *Acosta Roa Off. Fulfilling Duties of Field Off. Dir.*, No. 25-CV-07802, 2025 WL 2637565, at *2 (N.D. Cal. Sept. 12, 2025) (citing *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017))

4

(Seeborg, C.J.). The moving party must show: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary injunction, (3) that the balance of the equities tip in his favor, and (4) that an injunction is in the public interest." *Id.* (citation modified).

Injunctive relief is an extraordinary measure, but it "is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). If there are serious questions as to the merits, injunctive relief may still be appropriate if the balance of the hardships tips sharply in favor of the moving party and the remaining two factors are also satisfied. *Id.* (citing *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014).)

## IV.    ANALYSIS

### A.  Scola Is Substantially Likely to Succeed on the Merits of Each of Her Claims.

Scola brings claims against Barnes for direct trademark infringement, conversion, and unfair competition, and against Paramount and WOW for contributory trademark infringement. Scola is substantially likely to succeed on each of these claims.

#### a.  Scola Is Substantially Likely to Prove that Barnes Directly Infringes on Her Trademark.

To prevail on her direct trademark infringement claim against Barnes, Scola must show that (1) she has a valid, protectable trademark; and (2) Barnes's use of the mark is likely to cause confusion. *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007) (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047, 1053 (9th Cir. 1999).)

#### i.  Scola Has a Valid, Enforceable Trademark.

A trademark plaintiff may show that she has a valid, enforceable trademark by showing: (1) a federally registered mark; (2) a descriptive mark that has acquired a secondary meaning in the market; or (3) a suggestive mark. *Id.* (citing *Brookfield*, F.3d at 1053). In this case, Scola has a valid and enforceable mark because LEXI LOVE is federally registered and is a descriptive mark that has acquired a secondary meaning.

5

As discussed above, Scola currently holds a federally registered mark for LEXI LOVE in ICs 35 and 41. (RJN, Ex. 3, LEXI LOVE, Reg. No. 7727806 (Mar. 18, 2025).) Scola applied for registration on February 10, 2024, and therefore, she is presumed to have a valid and enforceable mark since February 10, 2024. *See Sengoku Works Ltd. v. RMC Intern., Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("[T]he registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence.").

Scola's common law rights extend much further back, however. Even before she filed an application for her current federally registered mark, Scola had acquired a valid and enforceable mark by using a descriptive mark that had acquired a secondary meaning since 2004. *See Paul Frank Indus., Inc. v. Sunich*, 502 F. Supp. 2d 1094, 1100 (C.D. Cal. 2007) (explaining that a personal name is a descriptive mark). "Secondary meaning is the association consumers have between a mark and a particular source." *Cash v. Interscope Geffen A&M Records*, No. 22-CV-01900, 2024 WL 3914517, at *6 (C.D. Cal. July 22, 2024) (citation modified). In considering whether a mark has a secondary meaning, courts consider the *Levi Strauss* factors:

> (1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.

*Id.* (quoting *Levi Strauss v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985).)

Two cases applying the *Levi Strauss* factors to infringement of a performer's name are instructive. In the first case, *Cash v. Interscope Geffen A and M Records*, the court considered a trademark dispute initiated by Briana Cash, an independent musical artist, against Brianna Castro, a singer-songwriter, for Castro's use of the stage name "Brianna Cash." 2024 WL 3914517, at *1–2. In considering whether Cash had a valid trademark, the court recounted Cash's career, ultimately finding that her active career provided evidence of a secondary meaning. *Id.* at *6. Specifically, the court found that there was evidence that Cash's mark had acquired a secondary meaning

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

because:

> Cash has released numerous songs and albums through Spotify, iTunes, and Amazon, each of which was promoted using her mark "Briana Cash." Cash has also used her mark in connection with her role as a voting member of the Recording Academy. To gain voting membership, the Academy considers: "Recordings available for streaming/download through recognized music aggregators," "Documented sales/chart information," "Established, active website/social media/online presence," "active marketing and promotion efforts," "Print material," Press releases," and others. Cash is also a member of SAG-AFTRA, the Guild of Music Supervisors, the Society of Composers and Lyricists, and the Alliance for Women Film Composers. Furthermore, by 2019, Cash's music on Spotify had been streamed approximately 52 thousand times by approximately 26 thousand listeners.

*Id.* (citation modified). Critically, the court rejected the defendants' argument that Cash had failed to establish a secondary meaning because her advertising was "nominal, at best" and that her "record sales [were] negligible." *Id.* (citation modified).

The court in *Blue v. Johnson* reached a similar conclusion in considering whether the defendant, an adult film star, had successfully proven that her mark had acquired a secondary meaning before the mark used by the plaintiff, a writer in the fields of human sexuality and pornography, had acquired a secondary meaning. No. 07-CV-05370, 2008 WL 2024995, at *1 (N.D. Cal. May 9, 2008). The court ruled that it was unlikely that the defendant's mark had achieved a secondary meaning before the plaintiff's had, noting that prior to the defendant's use of the name, the plaintiff had appeared in various events and productions in the United States and abroad as a "machine and robotics artist"; published online articles and columns in the fields of human sexuality, erotica, and pornography; published an article about sex in Good Vibes Magazine; signed a book deal to write a book called *The Sweet Life: Stories of Sexual Fantasies and Adventures for Couples*; was named one of the 25 most influential people online by Forbes.com; and writes a column for the San Francisco Chronicle. *Id.* at *4. The court found this to be "persuasive evidence" of continuous use and that the plaintiff's audience would likely have associated her name with her brand. *Id.*

Here, there can be no doubt of Scola's first use priority, and that in the years before Barnes's first alleged use of Scola's mark, consumers of adult films associated LEXI LOVE with Scola's work. Between 2004 and 2010, Scola acted in over 600 adult films with industry names such as

7

Adam and Eve, Brazzers, Elegant Angel, Evil Angel, Naughty America, PlayBoy, Penthouse, Wicked, and Vivid. (Scola Decl. ¶ 3.) Scola's on-screen success and recognition made her sought after talent for industry events. Scola was routinely hired to appear at the Adult Video Network Expo, invited to walk the red carpet at the Adult Video Network awards shows, and participated in Pornutopia, an adult convention held in Houston, Texas. (Scola Decl. ¶ 4; *see* morbidthoughts, *Lone Star Pornutopia 2009*, FLICKR (last accessed Feb. 25, 2026), https://www.flickr.com/photos/morbidthoughts/albums/72157622852567273/ (describing Lexi Love as a "familiar face" present at the 2009 Pornutopia event).) (Scola Decl. ¶ 8, Ex. I). In 2006 and 2008, Scola participated in the Skylar Neil Memorial Golf Tournament hosted by Vince Neil of Motley Crue as an incentive for golfers to participate in the tournament. (Scola Decl. ¶ 5.) She worked as a feature dancer at clubs all across the United States, received frequent fan mail, and was recognized in public. (Scola Decl. ¶¶ 6-7.) Plainly, the adult entertainment industry recognized LEXI LOVE as being connected with Scola's work between 2004 and 2009. (Scola Decl. ¶¶ 2–8.)

Scola continued to maintain her mark after Barnes's infringement allegedly began. Although Scola stopped performing in adult films in 2010, she remained very much part of the industry and continued to work as a feature dancer, attend red carpet events, and make appearances on radio talk shows. (Scola Decl. ¶ 6; *Brittany Andrews to Host Halloween Spooktacular at Webster Hall*, AVN (Oct. 22, 2012 7:14 P.M.), https://avn.com/press/video/brittany-andrews-to-host-halloween-spooktacular-at-webster-hall-36063 (Scola Decl. ¶ 29, Ex. J); *Lexi Love to Appear on Brooklyn College Radio Show "Sex and Politics" Thursday*, AVN (Nov. 13, 2013), https://avn.com/press/technology/lexi-love-to-appear-on-brooklyn-college-radio-show-sex-and-politics-thursday-51417) (Scola Decl. ¶ 40, Ex. K). She was also cast in the television series *Look*, acted in the music video Help Me by DJ Eric Sharp, and was credited as a voice actor for Grand Theft Auto V. (See @rockitsciencelabs, *Eric Sharp-Help Me*, YOUTUBE (June 6, 2013), https://www.youtube.com/watch?v=bmdKoaHNKKY (Scola Decl. ¶ 41, Ex. L); *Lexi Love*, IMDB (last accessed Feb. 26, 2026), imdb.com/title/tt3294732/fullcredits/?ref_=tt_cl_sm (Scola Decl. ¶ 42, Ex. M). In 2014, Scola acted in the horror film KillCast. *Filmography and Screen Credits*, LEXI LOVE (last accessed Feb. 27, 2026), https://www.lexilove.com/actor (Scola Decl. ¶ 43, Ex. N)).

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Between 2015 and 2018, Scola became a member of SAG-AFTRA as Lexi Love, acted in the sci-fi romance film *Diminuendo*, and worked as an associate producer on the film *Disposition*. (Scola Decl. ¶ 14; *Lexi Love*, IMDʙ (last accessed Feb. 27, 2026), https://www.imdb.com/name/nm1328999/ Scola Decl. ¶ 44, Ex. O) In 2019, Scola acted in the film *Jexi*. (*Id.*) Between 2020 and 2023, in the midst of an industry-wide shutdown due to COVID-19 and the 2023 Writers Guild strike (with which SAG-AFTRA aligned), Scola maintained a strong social media presence. At this point, X (formerly Twitter) had approved Scola's Lexi Love accounts for monetization, and Scola was posting content in an effort to generate revenue and maintain her following. (Scola Decl. ¶ 15.). Between 2024 and 2025, Scola produced and released an album and acted in a Super Bowl LX commercial, which aired in February 2026. (Scola Decl. ¶¶ 16, 30.) Scola's work constitutes continuous and uninterrupted use of the Mark LEXI LOVE. At no time did she abandon her mark, nor is there any of the requisite evidence of Scola's intent not to resume use. *See* 15 U.S.C. 1127.

**ii.  Scola's Mark Is Confused with Barnes's Work as Lexi Love.**

To succeed on her direct infringement claim against Barnes, Scola must also show that Barnes's mark is similar enough to hers to cause confusion. *Ironhawk Techs, Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1159 (9th Cir. 2021) (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005)).

> To assess whether there is a likelihood of reverse confusion, courts consider the *Sleekcraft* factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*Id.* at 1160 (quoting *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1080 (9th Cir. 2005)). None of these factors are dispositive, nor are they exhaustive. *Id.* (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014)). They do change slightly, however, depending on whether the claim is a forward confusion or reverse confusion claim. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 n.5 (9th Cir. 2002).

"Forward confusion occurs when consumers believe that goods bearing the junior mark

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

came from, or were sponsored by, the senior mark holder." *Surfvivor*, 406 F.3d at 630 (citation modified). Reverse confusion, on the other hand, "occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Id.* (citation modified). In these cases, "the smaller senior user, such as [Scola], seeks to protect [her] business identity from being overwhelmed by a larger junior user who has saturated the market with publicity." *Cohn*, 281 F.3d at 841. Scola's claim against Barnes is one for reverse confusion.

### 1.    Strength of the Mark

Although trademark infringement analyses typically consider the strength of the plaintiff's mark, in a reverse confusion case, "the inquiry focuses on the strength of the junior mark because the issue is whether the junior mark is so strong as to overtake the senior mark." *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000) (citation modified). Well-known, heavily advertised junior marks are frequently considered strong. *See Surfvivor*, 406 F.3d at 632 ("The Survivor series has high public recognition and the producers heavily advertise the show. These circumstances increase the strength of the mark.").

As discussed above, Scola's mark acquired a secondary meaning during her career in adult entertainment, and she has continued to maintain a strong mark since she expanded her career outside of the adult entertainment industry. There can be no doubt, however, that Barnes's fame, and, in turn, the strength of her mark, far surpassed Scola's as a result of her appearance on *Drag Race*. From January 3, 2025, through April 18, 2025, Barnes was showcased weekly on an immensely popular television show. (*See* Katie Campione, *"RuPaul's Drag Race" Season 17 Holds Steady in Key Demos, Rakes in Biggest TV Share in Series History*, DEADLINE (Apr. 23, 2025), https://deadline.com/2025/04/rupauls-drag-race-season-17-ratings-mtv-1236375043/ Scola Decl. ¶ 45, Ex. P) Making it to the final four in the season finale, she was a long-running and widely recognized cast member. Barnes's success on the show allowed her to gain a significant independent following; Barnes's Instagram following increased by 1,144% during the airing of the show, the fifth largest increase of the Season 17 cast members. (Bernardo Sim, *Insta-Gag! See How Many IG Followers "Drag Race" Season 17's Queens Snatched*, OUT (Apr. 22, 2025), https://www.out.com/drag/rupauls-drag-race-season-17-queens-instagram-most-popular    Scola

10

Decl. ¶ 46, Ex. Q) Today, that figure has increased to 1,474%, with Barnes touting more than 274,000 followers on Instagram alone. Last year, Barnes performed on stage at the Video Music Awards with pop superstar Sabrina Carpenter and is regularly a guest on popular podcasts like Why Won't You Date Me? with Nicole Byer. (*See, supra*.) Indeed, even Barnes's GoFundMe, which has raised over $40,000 for Barnes's anticipated legal fees, showcases her popularity and reach. Barnes's mark, following her appearance on *Drag Race*, is far stronger than Scola's.

Because reverse confusion involves circumstances where consumers dealing with the senior mark holder believe that they are doing business with the junior one, the harm is that the junior user erases the senior user's identity. *Surfvivor Media, supra*, 406 F.3d at 630. The harm in reverse confusion cases is that the junior user saturates the market with a similar trademark and overwhelms the senior user's reputation. This is a textbook reverse confusion case, as Paramount and WOW's promotion of Barnes has resulted in market saturation that has overwhelmed Scola's use of the Mark. (Scola Decl. ¶¶ 22-25, 45-52.)

This case presents the precise harm the Ninth Circuit's reverse confusion doctrine was designed to prevent. For more than twenty years, Scola built a professional identity under the name Lexi Love. After Barnes appeared on a globally televised program distributed by Paramount and WOW – that is now become a global franchise – that identity was effectively overwhelmed. Consumers searching for "Lexi Love" now encounter Barnes first and assume that Scola's work originates from Barnes or is affiliated with Barnes. This case, and this Motion, therefore present the quintessential reverse confusion scenario in which the junior user's market power swamps the senior user's mark. Scola is at imminent risk of losing control over her Mark permanently, and suffering irreparable harm as a result. Without injunctive relief, Barnes's nationally broadcast use of the identical mark will continue to saturate the market and permanently overwrite Scola's identity as Lexi Love — the precise harm the Ninth Circuit's reverse confusion doctrine exists to prevent.

### 2.  Proximity of the Goods

Proximity or relatedness of the services asks whether consumers are likely to associate the parties' services. *Surfvivor*, 406 F.3d at 633. The Ninth Circuit has "adopted a rather flexible

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

approach to the whole notion of competition." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012). It has, for example, held that two businesses "'are not properly characterized as non-competitors' where 'both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys or computer circuit boards and the Rocky Horror Picture Show.'" *Id.* (quoting *Brookfield*, 174 F.3d at 1056). The Ninth Circuit held that a reasonably prudent consumer was likely to be confused as to the origin stage name used by an adult film star and an author who wrote about human sexuality and reviewed pornography. *Blue*, 2008 WL 2024995, at *5.

A reasonably prudent consumer is likely to be confused about the origin of the mark LEXI LOVE based on the overlap in Scola and Barnes's work. Scola and Barnes are both entertainers. Both of their careers have involved live performances; Scola as a feature dancer and Barnes as a drag queen. They have both released music on iTunes and Spotify and supported other musical artists' creative works; Scola acted in a music video for DJ Eric Sharp, and Barnes performed on stage with pop singer Sabrina Carpenter at the 2025 Video Music Awards. They have both been featured in fictional television series; Scola acted in the HULU series *Look* directed by Adam Rifkin, and Barnes recently made an appearance on the HBO mini-series *Murder in Glitterball City*.

Scola and Barnes's careers also share similar themes. They have both worked in areas of entertainment that embrace and celebrate public expressions of sexuality. And in these spaces, both have been staunch advocates of safe sex. Scola began her career in the adult film industry and, after her mother died, she became a fierce advocate of safe sex in the adult entertainment industry. (Jeremy Glass, *I Got Into Porn on a Dare. Here's How I Got Out*, THRILLIST (Mar. 3, 2016), https://www.thrillist.com/sex-dating/nation/how-to-get-out-of-porn; Scola  Decl. ¶¶ 8, 47, Ex. R.) Barnes, too, is committed to raising awareness for safe sex. Barnes frequently speaks openly about her experience living with HIV and recently partnered with telehealth provider MISTR to provide free HIV and STD prevention medications. (*Lexi Love Rolls into Action with MISTR to Serve Sexual   Health   Realness*,   MISTR   (May   9,   2025),   https://www.globenewswire.com/news-

12

release/2025/05/09/3078146/0/en/Lexi-Love-Rolls-into-Action-with-MISTR-to-Serve-Sexual-Health-Realness.html Scola  Decl. ¶ 48, Ex. S)

Scola and Barnes's works are not identical; but they are not required to be. They have significant overlap, certainly enough that likely that a reasonably prudent consumer would think that Scola and Barnes's works come from the same source. This factor supports a finding of likelihood of confusion.

### iii.  Similarity of the Marks

Marks that are more similar are more likely to cause confusion. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). This factor plainly favors Scola. Scola's mark is LEXI LOVE, and Barnes performs under "Lexi Love." The names are identical in sound, appearance, and meaning. They could not be made to be more similar.

### 1. Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 352 (9th Cir. 1979) (citing *Plough, Inc. v. Kreis Lab'ys*, 314 F.2d 635, 639 (9th Cir. 1963)). There is no shortage of evidence of actual confusion in this case. There have been over 250 instances of Scola being tagged online by accounts that intended to tag Barnes. Countless media outlets have made this mistake, including Good Day New York co-host Rosanna Scotto, the LGBTQ advocacy group GLADD, and Out Magazine; famous publicist Kelly Cutrone left a voicemail on Scola's Instagram inviting Barnes to New York Fashion Week. Scola has been confused as Barnes by individuals in the *Drag Race* universe, including celebrity stylist and designer Queen of Melrose and fellow drag queens Sister Roma; venues at which Barnes was booked to perform, including Royale Boston and the 9:30 Club; and countless fans. These exemplars showcase the widespread consumer confusion between Scola and Barnes and tip this factor in favor of Scola. (Scola Decl. ¶ 22.)

### 2.  Marketing Channels Used

This factor favors Scola because she and Barnes use substantially similar, if not identical, marketing channels. Both parties rely heavily on the internet, particularly social media, to advertise their brands. This creates a high likelihood that consumers will run across Barnes's content first

13

and consume her content to the exclusion of Scola's. *See Brookfield*, 174 F.3d at 1057 ("West Coast and Brookfield both utilize the Web as a marketing and advertising facility, a factor that courts have consistently recognized as exacerbating the likelihood of confusion."). Moreover, both parties' content is available on streaming services. One can imagine a scenario where a consumer searches "Lexi Love" to find Scola's work and happens upon Barnes's content and chooses to watch that instead. *See Brookfield*, 174 F.3d at 1057 ("A consumer who was originally looking for Brookfield's products or services may be perfectly content with the West Coast's database . . . but he reached West Coast's site because of its use of Brookfield's mark."). This likelihood supports a finding of likelihood of confusion. (Scola Decl. ¶¶ 15, 27.)

### 3. Types of Goods and the Degree of Care Likely to Be Exercised by Purchaser

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. As the price of goods and services increases, the typical buyer will exercise a higher degree of caution. *Id.*

This case involves performers whose talents are showcased on television, streaming services, and social media. Their online content is offered either for little or no money or available with an existing subscription. Scola and Barnes's work can largely be consumed by the click of a button, often with no additional cost. This leads to consumers exercising a low degree of care. *See Fizz Social Corp. v. Maplebear, Inc.*, 791 F. Supp. 3d 990, 1014 (N.D. Cal. 2025) (explaining that mobile application consumers exercise a low degree of care because the applications are free and require minimal time and effort to download); *Talent Mobile Dev., Inc. v. Headios Grp.*, No. 16-CV-0464, 2017 WL 6940548, at *8 (C.D. Cal. Oct. 3, 2017) (same); *see also Amazon.com v. Pionera Inc.*, No. 22-CV-01491, 2023 WL 4424649, at *6 (E.D. Cal. July 10, 2023) ("Navigating amongst web sites involves practically no effort whatsoever, and arguments that Web users exercise a great deal of care are unconvincing.") (quoting *GoTo.com*, 202 F.3d at 1209) (citation modified). Because consumers of Scola and Barnes's content are not likely to exercise much care at all in choosing whose content to consume, this factor weighs in favor of Scola and a finding of likelihood of confusion.

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

#### 4. Barnes's Intent in Selecting the Mark

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's mark." *Ironhawk*, 2 F.4th at 1167 (citation modified). In the reverse confusion context, the inquiry is "whether there is some evidence that the junior user, when it knew of the senior user, was at fault for not adequately respecting the rights of the senior user." *Id.* (citation modified). Intent can be established through evidence that the junior user intentionally pushed the senior user out of the market or "by evidence that, for example, the junior knew of the mark, should have known of the mark, intended to copy the senior, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Id.* (quoting *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir. 2017)) (citation modified).

Barnes claims that she did not know of Scola or her rights to LEXI LOVE before she adopted the name as her own. But she should have. Scola's two-decade career as Lexi Love has never been a secret. Scola began using the name Lexi Love professionally in 2004. As discussed above, Scola gained an enormous amount of success early in her career. She was widely known, and prior to *Drag Race*, internet searches for "Lexi Love" yielded results for Scola and Scola's work as Lexi Love. (Scola Decl. ¶ 17; *see also* @not_addictive, *Lexi Love Copyright Situation*, REDDIT (last accessed Feb. 25, 2026), https://www.reddit.com/r/RPDRDRAMA/comments/1mwoxw5/lexi_love_copyright_situation/ ("[T]his is the porn star who came up when we all googled the S17 cast when it was leaked.") Scola Decl. ¶ 49, Ex. T.) Since 2009, when Barnes allegedly began performing as Lexi Love, a simple internet search would have revealed that another owned the rights to the name. But Barnes has admitted that she did not consider potential trademark issues before selecting her name. On a recent podcast appearance, the host stated: "it is interesting when you start being in the public eye what issues arise like never in your life did you think that your name, your chosen name would be a thing," to which Barnes responded: "My drag name turned chosen name would end up being something somebody on the other side of the country is like 'nuh uh.'" (Why Won't You Date Me? with Nicole Byer, *supra*, at 32:38–32:58.) Had Barnes done even nominal research into the name

15

Lexi Love prior to adopting it, she would have learned that it was not hers to use. This factor weighs in favor of Scola.

### 5.    Likelihood of Expansion of Services

As discussed above, the parties' work is already substantially similar and overlapping. And there is strong evidence that Scola and/or Barnes will continue to expand into the other's orbit even more than they already have. The entertainment industry is unique in that performers are rarely cabined to one genre or medium. Barnes's talents have traditionally been limited to the drag world. But she has shown a willingness and desire to expand those talents by performing on a hit reality television show. And her sudden increase in notoriety from that show has opened up a world of opportunities for her outside of drag. Barnes has since appeared in an episode of the fictional mini-series *Murder in Glitterball City*. She has made appearances on *Drag Race*-affiliated spin-offs like *My Untucked Life*. Barnes's expansion from drag performances to fictional and non-fictional reality television is sure to be just the start. Contestants who perform on reality television shows often pivot to careers in television and work as spokespeople for brands and products. This is all work that Scola has done and continues to do. Any expansion of Barnes's career into these spaces would risk further confusion and competition. This factor weighs in favor of Scola.

### b.    Scola Is Substantially Likely to Succeed on the Merits of Her Contributory Trademark Infringement Claim Against Paramount and WOW.

Scola brings a contributory infringement claim against Paramount and WOW. To state a claim for contributory infringement, Scola must show that Paramount and WOW (1) had knowledge of Barnes's infringing activity; and (2) induced, caused, or materially contributed to the infringing conduct. *Perfect 10, Inc. v. Via Intern. Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). "Where, as here, the defendant provides a service rather than a product to an infringer, courts 'consider the extent of control exercised by the defendant over the third party's means of infringement.'" *YZ Prods., Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 765 (N.D. Cal. 2021) (quoting *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).

Both elements are readily met in this case. As an initial matter, there can be no dispute that Paramount and WOW are on notice of Scola's trademark and have been since December 4, 2024,

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

and at the latest, August 2025. (Scola Decl. Ex. C.) Since then, Scola has sent cease-and-desists to both companies, notifying them of the rights she holds to the name Lexi Love and demanding that they remove all content identifying Barnes as Lexi Love. (*Id.*) Paramount and WOW have been well aware of Scola's rights to LEXI LOVE for more than a year.

Even after they knew of Scola's rights, Paramount and WOW materially contributed to Barnes's infringement by permitting Barnes's infringement—her appearances on *Drag Race* as Lexi Love—to air and remain streaming on their platforms. Paramount and WOW quite literally provided the platform for Barnes's infringement. After they learned of Barnes's infringement, Paramount aired *Drag Race* and both companies made the show available for streaming on their respective streaming services. They likewise showcased Barnes on their social pages, posting content identifying Barnes as Lexi Love during and after the show. Following *Drag Race*, WOW produced and made available for streaming *Drag Race* spin-off content of Barnes as Lexi Love. In April 2025, WOW posted an episode entitled *The Road to RuPaul's Drag Race Lexi Love*, and in November 2025, it posted *My Untucked Life–Lexi* featuring Barnes as Lexi. Paramount and WOW's decision to make available content in which Barnes is infringing on Scola's rights creates an unremovable capsule where Barnes can infringe thousands of times each day, every time a viewer streams an episode of *Drag Race* Season 17 and related videos or views social media content of Barnes as Lexi Love. Paramount and WOW's decision to provide Barnes a space to infringe constitutes contributory infringement. *See Coach, Inc. v. Goodfellow*, 717 F.3d 498, 504–05 (6th Cir. 2013) (cited with approval by *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1003 (9th Cir. 2023)) (holding that a flea market operator who knew vendors were selling counterfeit goods was liable for contributory infringement because the flea market operator continued to rent spaces at the market to the infringing vendors).

Moreover, Paramount and WOW are responsible for Barnes's access to one of her primary methods of infringement: her Instagram account. When the Season 17 cast was announced, Scola reported Barnes's account for trademark infringement, and the account was removed. (Scola Decl. ¶ 21.) Ultimately, Barnes's account was reinstated, and it was Paramount that made this possible. (*See* Bob the Drag Queen, *Lexi from Drag Race Spills EVERYTHING* 1:59–2:18, YOUTUBE (Oct.

17

24, 2025), https://www.youtube.com/watch?v=pddkiI4D11g&t=119s Scola Decl. ¶ 50, Ex. U) Paramount's decision to help Barnes regain access to her social media account, which it knew she used as Lexi Love, likewise constitutes contributory infringement. Paramount and WOW have ultimate control over the content they stream and post, and their efforts to help Barnes infringe is as much a violation of state and federal trademark law as is Barnes's direct infringement. Therefore, Scola is likely to succeed on her contributory trademark infringement claim against these third-party defendants.

### c.  Scola Is Substantially Likely to Succeed on the Merits of Her Conversion Claim.

Scola also brings a conversion claim against Barnes. To establish a claim for conversion, a plaintiff must show (1) ownership of the property in question at the time of conversion; (2) that the defendant converted or disposed of the property by a wrongful act; and (3) damages. *English & Sons, Inc. v. Straw Hat Rests., Inc.*, 176 F. Supp. 3d 904, 921 (N.D. Cal. 2016) (quoting *Swingless Golf Club Corp. v. Taylor*, 732 F. Supp. 2d 899, 910 (N.D. Cal. 2010)). Numerous courts in the Ninth Circuit have held that trademarks can be the subject of conversion. *See id.*; *Protiviti Inc. v. Protiviti, LLC*, No. 23-CV-08442, 2024 WL 2967321, at *6 n.3 (C.D. Cal. June 12, 2024) ("Common law conversion equally applies to intangible property, such as trademarks.") (citation modified); *Google LLC v. Sonos, Inc.*, No. 20-CV-06754, 2022 WL 195850, at *5 (N.D. Cal. Jan. 21, 2022) ("[P]atents can properly be the subject of a conversion claim under California law so long as the application of the tort does not 'displace other, more suitable law.'") (collecting cases); *Longo v. Longo*, No. 20-CV-00829, 2020 WL 7774925, at *8 (C.D. Cal. Nov. 12, 2020) ("The TSS-owned Futures Marks can be the subject of a conversion cause of action.").

For the same reasons Scola is likely to prevail on her trademark infringement claim against Barnes, she is likewise likely to prevail on her conversion claim. First, Scola has owned the rights to LEXI LOVE for more than twenty years; her continuous use since 2004 gives her these rights. (Scola Decl. ¶¶ 2, 9–11.) Second, Barnes has repeatedly converted Scola's mark by adopting the name Lexi Love and using it as her own during on stage performances, as a contestant on *Drag Race*, on social media, and in advertisements. (Scola Decl. ¶¶ 19, 27.) Finally, Scola has suffered financial, reputational, and emotional harm as a result of Barnes's conversion. Since the

18

infringement began, Scola has spent thousands of hours attempting to enforce the rights to her name, was forced to drop out of an online education program to focus on enforcement efforts, and lost business opportunities as a result of the dispute. Scola's brand has also been significantly diluted. Prior to *Drag Race*, internet searches for "Lexi Love" yielded results for Scola. (Scola Decl. ¶ 17.) Today, they show results for Barnes, making Scola's efforts to advertise and market her brand nearly impossible. Finally, Scola has faced over a year of harassment and online vitriol because of her efforts to enforce her intellectual property rights. Almost daily, Barnes's fans hurl horrific insults at Scola, mock her career, and suggest she should die. For these reasons, Scola is likely to succeed on her conversion claim. (Scola Decl. ¶ 31.)

> **d.  Scola Is Substantially Likely to Succeed on the Merits of Her Unfair Competition Claim.**

Scola also brings an unfair competition claim against Barnes. "Courts have uniformly held that common law and statutory trademark infringement are merely specific aspects of unfair competition." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1031 (C.D. Cal. 2011) (citing *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979)). "Since trademark infringement is an example or form of unfair competition, stating a claim for trademark infringement is sufficient to state a claim for unfair competition." *Microsoft Corp. v. My Choice Software, LLC*, No. 16-CV-2187, 2017 WL 5643210, at *6 (C.D. Cal. Oct. 10, 2017). As discussed above, Scola has shown a substantial likelihood of success on the merits of her trademark infringement claim. She has therefore done the same for her unfair competition claim.

## B. Scola Will Suffer Irreparable Harm Absent an Injunction.

A party seeking a preliminary injunction must demonstrate that it is being harmed by the ongoing infringement. *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009). "In trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business, reputation, loss of trade and loss of good will." *Id.* (citing *Opticians Ass'n of Am. V. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)). "Irreparable injury exists where a court reasonably concludes that continuing infringement will result in loss of control over the plaintiff's reputation and good will." *Id.* (citing *Apple Comput., Inc. v. Formula Int'l Inc.*,

725 F.2d 521, 526 (9th Cir. 1984)).

Critically, Scola is entitled to a presumption of irreparable harm because she has shown a likelihood of success on the merits of her infringement claims. *See* 15 U.S.C. § 1116(a) ("[S]eeking an injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."). Even without this presumption, however, Scola can easily show that she has been and continues to be irreparably harmed by Barnes, Paramount, and WOW's infringement.

Scola's identity as Lexi Love has essentially been erased from the internet. *See Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp. 2d 1294, 1307 (W.D. Wash. 2010) (in a reverse confusion case, the senior mark holder was irreparably harmed because the junior mark holder completely overwhelmed the junior); *see also Maxim*, 654 F. Supp. 2d at 1036 (finding lost control over business reputation and goodwill where plaintiff's product My-iButton was consistently referred to as iButton, the name of the defendant's product). Barnes's fame following *Drag Race* allowed Barnes's mark to begin to overshadow Scola's. And when Scola tried to fight back against this by telling the internet that she, not Barnes, is Lexi Love, Scola's Instagram account was reported, causing her to be locked out of one of her primary methods for advertising and enforcing her trademark. Scola was locked out of her account for ninety days, and by the time she regained access, the damage was done. Barnes was the dominant Lexi Love on the internet, and Scola's mark was permanently devalued. (Scola Decl., ¶ 33.)

Her mark has likewise been devalued by the harassment Scola has received on the internet. (Scola Decl., ¶ 34.) Barnes has crafted a narrative that Scola is transphobic, insensitive to the obstacles Barnes has faced in her life, and only began trademark enforcement efforts as a way to become famous. Barnes's fans have latched onto this narrative and have spent months eviscerating and invalidating Scola on the internet. (*Id.*) Particularly harmful to Scola's business is the prominent narrative that her work as an AI architect is meaningless or invalid. *See, e.g.,* @Tericakes, *Ways to Support Lexi Love During this Crazy Copyright Situation*, REDDIT (last accessed        Feb.              26,              2026),

20

https://www.reddit.com/r/rupaulsdragrace/comments/1mxnad7/ways_to_support_lexi_love_during_this_crazy/ ("An AI slop maker/porn actress put out a statement saying that Lexi Love is legally her name.") (Scola Decl. ¶ 51. Ex. V). Comments like these have irreparably harmed Scola's brand as Lexi Love.[4] Indeed, an investor refused to collaborate with Scola's project Lexi Love Runway after the trademark dispute began. (Scola Decl. ¶ 29.) The internet never forgets, and the ridicule and hate directed at Scola will follow Scola's Lexi Love mark for the rest of her career if Barnes is not enjoined from using Scola's mark. (Scola Decl. ¶ 31.)

Notably, Scola filed this action and her request for injunctive relief as soon as was practicable. As soon as Barnes gained national exposure through Paramount's *Drag Race*, Scola began to contact attorneys. The advice she was given was to wait and see what the effects of the infringement would be. (Scola Decl. ¶ 32.) As soon as Scola realized the harm that Barnes's use of LEXI LOVE was causing through *Drag Race*, she began seeking representation to reclaim the rights to her mark. It was her difficulty finding representation, not a lack of urgency or risk of harm, that caused her to delay filing for relief. And Scola knew that this case, which involves complex areas of law and powerful adversaries, would be difficult to bring on her own.[5] Scola had one chance at enforcing her rights, and her inability to immediately retain counsel is in no way an indication that the harm she is suffering is not irreparable or that injunctive relief is not necessary.

**C. The Balance of the Harms Significantly Favor Scola.**

The balance of the harms favors Scola. As explained above, Scola is harmed daily from the

---

[4] Of course, it is the irreparable harm to Scola's trademark that is relevant to this element, not the irreparable harm she has suffered in general. Still, the personal and emotional impact that this has had on Scola deserves recognition. Scola is called profanities, mocked, and physically threatened almost daily. This online hate has caused Scola to restart antidepressants, caused personal strain on her personal relationships, and has generally impacted her entire life. (Scola Decl. ¶ 31, 33-34.).

[5] Indeed, even Barnes acknowledges that Scola's enforcement actions were weaker (or at least perceived as such) when she attempted them on her own. *See* Why Won't You Date Me? with Nicole Byer, *Lexi Love on the Legal Battle Over Her Name* 30:11–30:22, YOUTUBE (Nov. 21, 2025), https://www.youtube.com/watch?v=x-fNwcY8jVU&t=56s ("She's sending the cease and desist that's not even a real cease and desist that no lawyer is backing. That nobody's actually pursuing them that they're like you know what, we're . . . not gonna do it.") (Scola Decl. ¶ 52, Ex. W.)

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

infringement. She is losing business, her brand is irreparably tarnished, she is harassed merely for asserting the rights to her own intellectual property, and she has effectively been forced to take on trademark enforcement as a second full-time job. Barnes, Paramount, and WOW, on the other hand, would suffer no harm if they were enjoined from using LEXI LOVE. Barnes has a loyal and dedicated fan base who would continue to support her under a new name. And Paramount and WOW would likewise suffer no harm from revising their content of Barnes to eliminate use of LEXI LOVE and advertise her under a new name.

Even if Barnes, Paramount, or WOW would be harmed by an injunction, this factor would still weigh in favor of Scola. In deciding whether to grant an injunction or not and bestow harm onto the mark holder or the infringer, courts side with the mark holder because they have rights to the mark and the infringing party does not. *See Boldface Licensing %8F Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1198 (C.D. Cal. 2013) ("Here, the Court is well-aware of the impact an injunction will have on Boldface's business, which could amount to millions of dollars in losses. But the Court is also fully convinced that withholding an injunction will destroy Tillett's business . . . . The difference between the two is that Tillett has superior rights to Boldface. As a result, the balance of hardships tips sharply in Tillett's favor."). Scola seeks not only to prevent past harm, but future harm from continuing commercial use by Barnes, Paramount and WOW in connection with performances and promotions. This factor weighs in favor of an injunction.

### D. The Public's Interest Is Not Disfavored by Enjoining the Infringement of a Protected Trademark.

Finally, an injunction would not disserve the public's interest. Courts routinely recognize that protecting trademarks from infringement is in the public's interest. *Brookfield*, 174 F.3d at 1065 (explaining that the public's interest is promoted by protecting trademarks); *Masters Software*, 725 F. Supp. 2d at 1308 ("To the extent that the public has any interest in the outcome of this case, it is in permitting businesses and business owners who have invested in branding their products from losing control over their brands."); *Blumenthal Dist., Inc. v. Comoch Inc.*, 652 F. Supp. 3d 1117, 1135 (C.D. Cal. 2023) ("[A]n injunction would be in the public interest because 'where defendant's concurrent use of plaintiff's trademark without authorization is likely to cause

22

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

confusion, the public interest is damaged by the defendant's use.'") (quoting *AT&T Corp. v. Vision One SecuritySys.*, No. 95-CV-0565, 1995 WL 476251, at *7 (S.D. Cal. July 27, 1995)) (citation modified). An injunction would do just that: enforce Scola's legal right to exclusively use her mark.

### V.    CONCLUSION

Barnes, Paramount, and WOW have stolen Scola's property for too long, and they should be enjoined from using Scola's mark in commerce. Scola has readily met her burden for injunctive relief: She has shown that Barnes, Paramount, and WOW are infringing on her trademark and that without judicial intervention, Scola's mark will continue to be erased. She has shown that the harm she faces significantly outweighs any harm to Barnes, who has a dedicated following that will happily support her under a new name. Moreover, Paramount and WOW are massive companies with the resources to remove Barnes or her infringing conduct from their platforms. Finally, the public's interest would not be disserved, and would in fact be served, by returning a trademark to its rightful owner. Scola respectfully requests that this Court grant Scola's request for injunctive relief, and enter a preliminary injunction enjoining Barnes, Paramount, and WOW from using Scola's mark in commerce. At a minimum, Barnes should be prevented from continuing to market, promote, or perform in the future as Lexi Love.

Respectfully submitted,

WINTHROP LAW GROUP, P.C.

Dated: March 09, 2026                    */s/ Reid A. Winthrop*

Reid A. Winthrop
Attorney for Selena Scola

23

SELENA SCOLA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF