Reid A. Winthrop (SBN 223527)
Henry Harmeling IV (SBN 207673)
**WINTHROP LAW GROUP, P.C.**
120 Newport Center Dr.
Newport Beach, California 92660
Phone:  949-269-3256  |  Fax:  949-432-3526
reid@winthroplawgroup.com
henry@winthroplawgroup.com

Attorneys for Selena Scola

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CODY BARNES, professionally known as LEXI LOVE, | CASE NO. 3:25-cv-10837 |
| Plaintiff, | **DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (IN RESPONSE TO COUNTER-DEFENDANTS PARAMOUNT AND WOW)** |
| vs. | |
| SELENA SCOLA, | |
| Defendant. | |
| SELENA SCOLA, aka LEXI LOVE, | Judge: Honorable Richard Seeborg<br>Hearing Date: April 16, 2026<br>Time: 1:30 p.m.<br>Ctrm: 3 – 17TH Floor |
| Counter-Claimant, | |
| vs. | Complaint filed: December 19, 2025<br>Counterclaim filed: March 9, 2026 |
| CODY BARNES, an individual; PARAMOUNT SKYDANCE CORPORATION, a Delaware corporation; and WORLD OF WONDER PRODUCTIONS, INC., a California corporation, | [Filed concurrently with:<br>- Reply to Opposition by Barnes<br>- Supplemental Declaration of Selena Scola] |
| Counter-Defendants. | |

**Table of Contents**

I.   INTRODUCTION ..................................................................................................... 1

II.  COUNTER-DEFENDANTS MISAPPLY THE ROGERS TEST ............................................. 2

    A.  The Rogers Doctrine Does Not Apply Where the Use Functions as a
       Trademark ....................................................................................................... 2

    B.  Even Under Rogers, Counter-Defendants' Use Is Explicitly Misleading ........................... 5

III. THE OPPOSITION IGNORES THE REVERSE CONFUSION ARGUMENT ...................... 6

IV.  THE DELAY ARGUMENT DOES NOT DEFEAT IRREPARABLE HARM ...................... 7

    A.  The Harm Is Ongoing and Escalating .............................................................. 7

    B.  Counter-Defendants' Cases Are Distinguishable .............................................. 9

V.   COUNTER-DEFENDANTS' ATTACK ON SCOLA'S REGISTRATION IS
    INSUFFICIENT TO DEFEAT LIKELIHOOD OF SUCCESS AT THIS
    STAGE ................................................................................................................... 10

    A.  Scola's Registration Is Entitled to a Presumption of Validity .......................... 10

    B.  The Fraud Argument Requires Proof Counter-Defendants Have Not
       Offered ....................................................................................................... 10

    C.  Barnes's Priority Claim Is Contested ............................................................. 11

VI.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
    INJUNCTIVE RELIEF ........................................................................................ 12

    A.  Counter-Defendants Mischaracterize the Relief Scola Seeks ........................... 12

    B.  The Equities Favor the Senior Rights Holder ................................................. 12

    C.  The Public Interest Supports Protecting a Valid Trademark ............................ 13

VII. PERFORMER IDENTITY IS A PROTECTABLE COMMERCIAL
    INTEREST ........................................................................................................... 13

VIII. CONCLUSION .................................................................................................... 15

**Table of Authorities**

**Cases**

*Jack Daniel's Props., Inc. v. VIP Prods. LLC,* 599 U.S. 140 (2023) ................................ 1, 2, 3, 15

*Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) ........................................................ 1, 2, 3, 4, 5, 6

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) ........ 2, 4

*Hara v. Netflix, Inc.*, 146 F.4th 872 (9th Cir. 2025) ........................................................... 2, 3, 4, 5

*Empire Distribution, Inc. v. Twentieth Century Fox Television*, 875 F.3d 1192 (9th Cir. 2017) .... 4

*Mattel, Inc. v. MCA Records*, Inc., 296 F.3d 894 (9th Cir. 2002) ..................................................... 5

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) ................ 6, 7, 12, 14

*Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) ................................................................. 6, 7

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239 (9th Cir. 2013) ....................... 8, 14

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) ................................... 9, 14

*Real USFL, LLC v. Fox Sports, Inc.*, 2022 U.S. Dist. LEXIS 72857 (C.D. Cal. 2022) ................. 9

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374 (9th Cir. 1985) ............................ 9

*Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (2d Cir. 1994) ..................................................... 9

*In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009) ....................................................................... 10

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931 (9th Cir. 2006) ............... 11

*Boldface Licensing + Branding v. By Lee Tillett, Inc,* 940 F. Supp. 2d 1178 (C.D Cal. 2013) ... 12

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ................. 13

*Yuga Labs, Inc. v. Ripps*, 144 F.4th 1137 (9th Cir. 2025) ............................................................. 13

*Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) ............................................................... 13

*Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988) ............................................................. 14

*Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996) ......................................... 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................. 13

*Commodores Ent. Corp. v. McClary*, 879 F.3d 1114 (11th Cir. 2018) ........................................ 14

*Sunearth, Inc. v. Sun Earth Solar Power Co.*, Ltd., 846 F. Supp. 1063 (N.D. Cal. 2012) ........... 15

**Statutes**

15 U.S.C. § 1115(a) .................................................................................................................... 10

DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Counter-Defendants Paramount Skydance Corporation and World of Wonder Productions, Inc. (collectively, "Counter-Defendants") primarily oppose Counter-Plaintiff Selena Scola's ("Scola") motion on a single overarching premise: that the First Amendment categorically insulates any use of a trademark within a television program from Lanham Act scrutiny. That premise is wrong as the Supreme Court has held in *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023). The First Amendment does not shield uses of a mark that function as source identifiers, particularly when used for commercial purposes for financial gain, and that is precisely what Counter-Defendants' use of Scola's federally registered trademark does.

This case does not involve a fleeting reference, parody, or fictional character conjured for narrative purposes. Counter-Defendants have systematically used the name "Lexi Love", an identifier identical to Scola's federally registered trademark (the "Mark"), to identify, promote, and commercially exploit a real entertainer competing in the same marketplace as Scola. They did so week after week across national television, streaming platforms, music, and social media. That is not expressive content protected by *Rogers v. Grimaldi*, it is commercial trademark use.

Moreover, even if the *Rogers* test were somehow applicable here, Counter-Defendants' use fails that test's second prong because it is explicitly misleading. The documented confusion, over 250 instances of misdirected tagging and identification, lost business opportunities, and industry-wide misattribution, is not incidental. It is the direct and predictable consequence of broadcasting an identical mark in the same entertainment field to identify a real, active performer – the Mark Scola has used continuously and uninterrupted since 2004.

The Opposition also ignores entirely the doctrine of reverse confusion, which is the governing framework here. Counter-Defendants are not accidental infringers who stumbled into a name conflict. They are a media conglomerate with a massive promotional infrastructure that has overwhelmed Scola's longstanding identity in her own Mark. That is a textbook reverse confusion case, and the Ninth Circuit has recognized the doctrine precisely to address it.

Counter-Defendants' remaining arguments – delay, challenges to Scola's registration, and invocations of "prior restraint" – also do not survive scrutiny. Counter-Defendants' arguments

DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

regarding delay are particularly objectionable in light of the imbalance of power between these media conglomerate Counter-Defendants, and Scola, in this reverse confusion case. Moreover, courts recognize that a plaintiff may investigate and assess harm before seeking injunctive relief, which Scola did. Such evaluation does not defeat irreparable harm where the infringement is ongoing and continues to impact the plaintiff's brand and reputation.

The harm continues as set forth in the Scola Declarations and Motion, as Counter-Defendants continue to stream, promote, release new content, and commercially exploit the "Lexi Love" name, causing ongoing confusion and reputational damage. Injunctive relief is intended to prevent precisely this type of continuing and compounding harm. The *Winter* factors are met by Scola. The Court should therefore grant the preliminary injunction.

## II.　COUNTER-DEFENDANTS MISAPPLY THE ROGERS TEST

### A. The Rogers Doctrine Does Not Apply Where the Use Functions as a Trademark

Counter-Defendants anchor their Opposition on *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ("*Rogers*"), insisting that any use of "Lexi Love" within an expressive work is beyond the reach of the Lanham Act. But *Rogers* has never stood for such a broad proposition, and recent Supreme Court authority forecloses the reading Counter-Defendants offer.

In *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023) ("*Jack Daniel's*"), the Supreme Court held that when a defendant uses another's mark "as a mark", i.e., as a source identifier, ordinary trademark principles apply without resort to *Rogers*. The Supreme Court explained that *Rogers* is designed to protect uses of marks that are truly expressive, where the mark is not functioning to identify the defendant's own goods or services. That principle applies here because Counter-Defendant Cody Barnes ("Barnes"), individually and by and through Counter-Defendants, are using "Lexi Love" to identify and promote commercial entertainment services centered on a real performer, and for commercial exploitation for their financial benefit.

The Ninth Circuit had already established the same limiting principle. *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) ("*E.S.S. Entertainment*"), applied *Rogers* to a mark used as an element of artistic expression inside a video game, not to identify the developer's own products or services. In *Hara v. Netflix, Inc.*, 146

2

F.4th 872 (9th Cir. 2025) ("*Hara"),* the Ninth Circuit applied *Rogers* in the context of an expressive work and emphasized that the relevant inquiry focuses on whether the defendant's use explicitly misleads as to source.

What Counter-Defendants actually do here is categorically different. The record is unambiguous in demonstrating that Counter-Defendants use the name "Lexi Love" to (1) identify a real performer competing in the same entertainment marketplace as Scola; (2) promote that performer across television, live events, streaming platforms, and social media; and (3) commercially exploit that identity for their own financial benefit. (Scola Decl. ¶¶ 15–21.) That is not expressive content; it is branding for financial gain, and it continues. (Scola Supp. Decl., ¶ 3.)

Counter-Defendants anticipate this conclusion by arguing that they use "Lexi Love" merely as a cast member's name, not as a source identifier for Drag Race itself, and that *Jack Daniel's* therefore does not displace *Rogers*. (*See* Opp. at 21–22.) That argument misreads both *Jack Daniel's* and the record. The Supreme Court held that *Rogers* does not apply where a defendant uses the challenged mark "as a mark," that is, as a designation of source for its own goods or services. *Jack Daniel's. supra,* 599 U.S. at 157. That principle applies here because Counter-Defendants are using "Lexi Love" to identify and promote commercial entertainment services centered on a real performer, and without question for financial gain.

Counter-Defendants use "Lexi Love" not merely as a passing narrative reference but as the commercial identifier for a real entertainer they cast, promote in advertising, feature across their social media platforms, and continue to monetize through streaming. That use performs the classic trademark function of identifying a source of entertainment services, Barnes's services, in the marketplace. The fact that the identified source is a performer rather than a studio does not take the use outside *Jack Daniel's*. If anything, it makes the trademark function clearer in that Counter-Defendants are using the name to brand and sell a performer, which is the core of what a performer's trademark does. Notably, Counter-Defendants submit no evidence that the name "Lexi Love" is somehow "artistically relevant", as opposed to commercially relevant, to Barnes' casting on Drag Race. Counter-Defendants citations are to Barnes' Complaint, not a declaration from either Barnes nor Counter-Defendants, and even the most relevant citations to the

3

DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Complaint are for commercial, not artistic purposes ("appearing in every episode…entire season available to stream on its Paramount Plus platform…on its streaming platform, WOW Presents Plus.") (Opposition, pg. 9:23-25, 10:1-2.) Notably, none of the Counter-Defendants submit a declaration or any other evidence in support of their oppositions.

*Rogers* involved the use of a celebrity name in the title of a film where the reference was metaphorical and part of an expressive work. See *Rogers, supra,* 875 F.2d 994. Here, by contrast, "Lexi Love" is not used as part of a fictional or artistic reference, but as the actual name of a performer offering entertainment services in the marketplace. This is not expressive reference, it is commercial identity use, which falls outside the protection of *Rogers*. In fact, Barnes admits that she has performed under several names throughout the course of her career, which directly undermines her claim of artistic expression. (Scola Decl., ¶ 25.)

Similarly, *E.S.S. Entertainment* does not support Counter-Defendants' position. In *E.S.S.*, the challenged mark appeared as a background element within a fictionalized video game environment and was not used to identify any real-world performer or competing service. *Id.* at 1099–1100. The court emphasized that the use was part of the expressive setting and did not function as a source identifier. Here, in contrast, "Lexi Love" is used as the name of a real performer in the marketplace, directly identifying the source of entertainment services and creating a direct collision with Scola's mark.

Counter-Defendants' reliance on *Empire Distribution, Inc. v. Twentieth Century Fox Television* 875 F.3d 1192, 1196–97 (9th Cir. 2017) ("*Empire Distribution*"), is likewise inapposite. In *Empire Distribution*, the title of a television show was found to be protected because it was artistically relevant and did not explicitly mislead consumers as to source. *Id.* at 1196–97. Again, by contrast, "Lexi Love" is not used as a fictional title or narrative element, but to identify and commercially promote a real performer, a cast member who has gone by several names, but whom Counter-Defendants chose to promote using Scola's protected Mark instead of any of the other various names Barnes has used over time. That is a materially different use.

*Hara* is also distinguishable as it involved an expressive work. The Ninth Circuit applied *Rogers* in the context of an expressive work and emphasized that the relevant inquiry focuses on

4

whether the defendant's use explicitly misleads as to source. Here, by contrast, it cannot be disputed that "Lexi Love" is used to identify and promote Barnes in commercial entertainment services in the marketplace, available on paid for streaming "Plus" platforms.

To the extent Counter-Defendants rely on *Mattel, Inc. v. MCA Records, Inc.* 296 F.3d 894 (9th Cir. 2002), that case involved a parody song referencing "Barbie" and did not involve the use of an identical mark to identify competing services. The court emphasized that the use was non-commercial parody and that consumers were unlikely to be confused about the source. Here, there is no parody. Instead, the identical name is used to identify a performer in the same field, and the record demonstrates actual confusion. (Scola Decl. ¶¶ 21–25.)

In short, each of Counter-Defendants' cited cases involves uses that are materially different from the conduct at issue here, namely, the use of an identical mark to identify a real performer in direct competition with an existing mark, and then promoted on paid for streaming platforms. Those cases, therefore, do not support the denial of injunctive relief.

**B. Even Under *Rogers*, Counter-Defendants' Use Is Explicitly Misleading**

Even accepting for the sake of argument that the *Rogers* test applies, Counter-Defendants cannot satisfy its second prong. As *Hara*, quoting prior Ninth Circuit authority, explains, the second prong requires "an explicit indication, overt claim, or explicit misstatement" as to source. Counter-Defendants argue that the mere presence of confusion is insufficient. But the record here presents far more than mere confusion. What distinguishes this case is the nature and mechanism of the confusion.

Counter-Defendants did not use a similar mark, or an allusive reference, or a fictional persona. They used the identical mark – "Lexi  Love" – to identify an entertainer offering competing services in the same industry, on the same platforms, to the same market. That use left consumers with no reliable way to distinguish the source. The documented consequences bear this out, with Scola identifying over 250 instances of tagging and identification confusion, misattribution of Scola's prior work to Barnes, misdirected business inquiries, and the loss of at least one prospective business relationship that collapsed after the confusion generated by Counter-Defendants' promotion took hold. (Scola Decl. ¶¶ 20–25, 29.) These are not the

5

incidental byproducts of an expressive work that happens to share a name with someone else, they are the foreseeable results of plastering an identical trademark across global media to market a competing performer. And by promoting Barnes as "Lexi Love" on social media platforms on which Scola had a long-established record as "Lexi Love" – domains bearing the name on every major social media platform (Scola Decl., ¶ 16, 17, 21.). Counter-Defendants' promotion of Barnes borders on intentionally created confusion for the purpose of financial gain.

### III.    THE OPPOSITION IGNORES THE REVERSE CONFUSION ARGUMENT

The Opposition's most glaring deficiency is its complete silence on the governing theory of harm cited in the Motion – reverse confusion. Counter-Defendants devote their Opposition to *Rogers*, irreparable harm, and registration validity, yet say nothing about the doctrine that most directly describes what has happened to Scola.

As set forth in the Motion, reverse confusion occurs when a junior user's extensive promotion so dominates the marketplace that consumers dealing with the senior user come to believe they are dealing with the junior user. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129–30 (9th Cir. 1998); see also *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) (explaining that reverse confusion occurs where a junior user's advertising "saturates the market" and overwhelms the senior user's mark). Crucially, in a reverse confusion case, the inquiry focuses on the strength of the junior user's mark in the marketplace—because that strength is precisely the source of the harm. *Dreamwerks*, *supra,* 142 F.3d at 1130.

This is a textbook case of reverse confusion intentionally caused by Barnes and Counter-Defendants. Before Drag Race Season 17, searches for "Lexi Love" returned results associated primarily with Scola. After Counter-Defendants' national promotional campaign, those same searches return results dominated by Barnes. Scola's own social media content, content bearing her mark, is now routinely misattributed to Barnes by third parties who have no idea that Scola exists. (Scola Decl. ¶¶ 20–21.) An investor who was previously engaged with Scola's Lexi Love Runway project withdrew after the confusion generated by Counter-Defendants' promotion made it impossible to distinguish Scola's enterprise from Barnes's. (*Id*. ¶ 29.) This is precisely the harm the reverse confusion doctrine was designed to address. As the Ninth Circuit has recognized,

6

reverse confusion protects senior users from being overwhelmed in the marketplace by the commercial dominance of a junior user. See *Dreamwerks*, 142 F.3d at 1129–30; *Cohn*, 281 F.3d at 841. Importantly, *Dreamwerks* confirms that reverse confusion focuses on the marketplace impact of the junior user's promotion, not merely the intent behind adoption. Here, of course, Counter-Defendants had actual notice of Scola's rights well before the most intensive phase of their promotional campaign. (Scola Decl. ¶¶ 19–20.)

Counter-Defendants' argument that Scola was insufficiently famous actually confirms the reverse confusion analysis rather than defeating it. The doctrine's purpose is precisely to protect smaller senior users from being overwhelmed by larger, later entrants. The fact that Counter-Defendants' promotional apparatus is so much larger than Scola's is not a defense, it is the source of the harm. And this is not a case where Scola only recently began the use of her Mark, or that Counter-Defendants did not know about her Mark. This is her brand, her livelihood, and has been since 2004. She took steps to trademark her name, to promote it over the course of 20 years in multiple entertainment fields, and across all major social media platforms. A simple trademark search reveals Scola's federal registrations since 2008. Without court intervention, Scola is in danger of losing the value of her life's work solely due to the unequal power of Counter-Defendants, and their intentional promotion of another performer using her identical Mark.

## IV. THE DELAY ARGUMENT DOES NOT DEFEAT IRREPARABLE HARM

### A. The Harm Is Ongoing and Escalating

Counter-Defendants lead with delay likely because they believe it is their strongest argument. However, their delay argument mischaracterizes both the timeline and the nature of the harm, and is not dispositive, it is merely a consideration. The timeline is set forth in the Scola Declaration, including her reasonable efforts to protect her Mark, and challenges in bringing this issue before a court. Counter-Defendants primary argument is that Scola took no action after receiving a response to her Cease and Desist efforts, and then requested extensions to respond to Barnes' Complaint. The former point is addressed below; as to the latter point, the docket (and Barnes' attorney declaration) evidences a single request for extension while Scola sought counsel, not the "multiple extensions" Counter-Defendants claim.

7

The Ninth Circuit recognizes that a showing of irreparable harm does not require a plaintiff to seek injunctive relief at the earliest conceivable moment. What matters is whether the harm is ongoing and not fully remediable by money damages. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Here, both conditions are met.

The harm alleged by Scola in her Counterclaim, and as set forth in her Declaration, is not merely historical, it continues every day that Counter-Defendants stream Season 17 of Drag Race, maintain social media content identifying Barnes as "Lexi Love," and promote Barnes's post-show appearances under that name. Each day of continued use deepens the reverse confusion, further entrenches Barnes's identification with the name in public consciousness, and pushes Scola's prior association with the Mark further into obscurity. The damage accumulates in precisely the way that trademark precedent recognizes as irreparable, because the destruction of brand identity and displacement of market position cannot be assigned a dollar figure after the fact. In fact, Barnes appears just recently in a February 2026 documentary released on HBO and promoted by Counter-Defendants, and performs across the country and Canada  as "Lexi Love" (Scola Supp Decl., ¶¶ 3-4.) Barnes has double-downed on her infringement, not only refusing the cease and desist, but filing a Complaint and continuing to infringe and harm Scola aggressively in effort to subsume Scola's Mark. It is difficult to imagine any more extreme continuing harm.

Moreover, the delay that Counter-Defendants emphasize was not passive acquiescence. Scola objected publicly to the moment Barnes's casting was announced, on December 4, 2024, and followed up with formal cease-and-desist letters in August 2025. (Scola Decl. ¶¶ 19–20, 26–27.) When WOW's counsel responded dismissively in August 2025 without engaging seriously with the substance of Scola's claims, Scola faced the practical reality that litigation against a media conglomerate would require representation she was working to obtain. (*Id*. ¶ 32.) That difficulty in securing counsel, particularly given the complexity of the legal issues and the resources of the opposing parties, is a recognized reason that can explain delay without negating urgency. It is qualitatively different from the kind of strategic inaction that courts have found to undermine irreparable harm. That principle applies with particular force in reverse confusion cases like the instant case. And unlike traditional infringement, the harm is not static—it

8

intensifies over time as the junior user's promotion expands. See *Surfvivor, supra*, 406 F.3d at 630. Counter-Defendants' own Opposition confirms that their exposure has grown dramatically through national television and media distribution. That growth is the source of the harm, not a reason to deny relief. Each additional broadcast, stream, and promotional use further entrenches the association of the "Lexi Love" mark with Barnes, and further displaces Scola's identity.

### B. Counter-Defendants' Cases Are Distinguishable

The delay cases Counter-Defendants cite involved plaintiffs who unambiguously sat on their rights with full knowledge of the harm and no practical impediment to acting sooner. See *Real USFL, LLC v. Fox Sports, Inc.*, 2022 U.S. Dist. LEXIS 72857 (C.D. Cal. 2022); *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374 (9th Cir. 1985). Here, the timeline is materially different, as is the balance of resources.

Counter-Defendants' delay argument completely disregards the unequal positions of the parties. Scola is a private individual, not a corporation with in-house counsel. Scola acted limited by the resources available to her, but to be sure, she did take action. (Scola Decl., ¶ 20, 26, 32-34.) This is not a case involving similarly situated commercial actors. Barnes is backed by major media entities represented by national law firms with substantial resources, while Scola was unrepresented, only recently able to retain a small firm with limited resources. The practical realities of securing counsel and preparing litigation against such well-funded adversaries necessarily affect timing. Courts recognize that delay must be evaluated in context. Where a junior user's market power rapidly expands and the senior user faces practical constraints in enforcing her rights, delay does not negate irreparable harm. See *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1558–59 (2d Cir. 1994). That principle applies with particular force in reverse confusion cases.

The record demonstrates that Scola did not sit on her rights, instead objecting publicly when Barnes was announced, issued cease-and-desist communications, and attempted to resolve the dispute without litigation. (Scola Decl. ¶¶ 19–20, 26–27.) Her ability to pursue formal legal action was affected by the difficulty of locating counsel, a reality that should not be held against her, particularly where the harm continued to grow during that period. (*Id*. ¶ 32.) She took

9

immediate informal action when Barnes was announced, pursued formal channels in August 2025, and filed this motion in March 2026 after retaining counsel and after the scope of the harm had become fully apparent. And critically, the harm has continued to grow during this period. Each month of streaming and social media promotion since December 2024 has added to the erosion of Scola's mark, as well as Barnes' continued appearances. (Scola Supp Decl., ¶¶ 3-4.)

Counter-Defendants also argue that because the Season 17 broadcast has already ended, any harm has already been done. (See Opp. at 16.) That argument mischaracterizes and ignores the ongoing harm. Drag Race Season 17 remains available for streaming on Paramount+ and WOW Presents Plus, Barnes continues to promote herself as "Lexi Love" in connection with post-show appearances, and the massive social media footprint generated during the broadcast continues to suppress Scola's online identity. (Scola Decl. ¶¶ 20–21, 36–37; Scola Supp Decl., ¶¶ 3-4.) An injunction would provide meaningful prospective relief.

## V.    COUNTER-DEFENDANTS' ATTACK ON SCOLA'S REGISTRATION IS INSUFFICIENT TO DEFEAT LIKELIHOOD OF SUCCESS AT THIS STAGE

### A.  Scola's Registration Is Entitled to a Presumption of Validity

Scola holds an active, federally registered trademark. Under the Lanham Act, that registration constitutes prima facie evidence of the mark's validity, Scola's ownership, and her exclusive right to use the mark in connection with the registered services. 15 U.S.C. § 1115(a). The burden falls on Counter-Defendants to rebut this presumption, they cannot simply allege that the registration is invalid and expect the Court to treat it as unprotected.

### B.  The Fraud Argument Requires Proof Counter-Defendants Have Not Offered

Counter-Defendants contend that Scola's 2025 registration should be cancelled on fraud grounds because her application listed a first use date they claim is inconsistent with the scope of the registered services. But the fraud standard is demanding, and a question of fact that should not be decided in a Motion for preliminary relief. Under *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009), invalidation on fraud grounds requires proof of a knowingly false material statement made with specific intent to deceive the USPTO. Negligence, misrecollection, or even an erroneous claim does not suffice.

10

DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Counter-Defendants submit no evidence in support of their Opposition other than the trademark filings themselves. Counter-Defendants offer only speculation, not proof, in support of their invalidation argument. They point to the fact that Scola listed a 2004 first-use date in connection with service categories that include digital and AI-driven talent, services they claim did not exist in 2004, and infer from that gap that she intended to deceive the USPTO. But Counter-Defendants also cite the expansive registration, which includes "entertainment services in the nature of live visual and audio performances by performing artists being both human clients". (Opposition, pg. 24:10-11.) Moreover, a trademark application's first-use date reflects the applicant's claim as to the earliest date of commercial use in connection with the applied-for services taken as a whole. Scola's career as a performing artist under the name Lexi Love began in 2004, and she has continuously used that name in entertainment-related services ever since, providing her common law first-use rights. Whether the application's description of those services precisely tracks the evolution of her career should not be considered at this preliminary stage in light of the, and is not grounds to deny the relief sought by the Motion.

Courts routinely decline to resolve complex cancellation disputes on a preliminary record. The appropriate vehicle for challenging trademark registration validity is a cancellation proceeding before the USPTO or a fully developed merits trial. At this stage, Scola's registration is entitled to its statutory presumption, as well as recognition of her undisputed first-use date.

**C.  Barnes's Priority Claim Is Contested**

Counter-Defendants also contend that Barnes has priority over Scola in the entertainment services category because Barnes began using "Lexi Love" as a drag name in 2009, before Scola pivoted from adult entertainment to mainstream performance work. But this argument stretches too thin the record. Scola held federal trademark registrations for "Lexi Love" in International Class 41 from 2008 through 2022, covering entertainment services broadly, and those registrations were contemporaneous with and prior to any sustained commercial use of the name by Barnes. (RJN, Exs. 1, 2.) Moreover, the abandonment defense Counter-Defendants implicitly invoke requires showing both non-use and intent to abandon, neither of which is established on this record. See *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 937 (9th

11

DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

Cir. 2006). Scola's declaration details her continuous use of the mark across multiple professional contexts throughout the period mischaracterized as abandonment. (Scola Decl., ¶¶ 2-17, 29-30.)

## VI. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

### A. Counter-Defendants Mischaracterize the Relief Scola Seeks

Counter-Defendants devote significant effort to the argument that Scola seeks a "prior restraint on free speech" that would require them to take an entire season of Drag Race off the air. But Scola requests an alternative as well. While Scola believes a preliminary injunction requiring the removal of all infringing content by Counter-Defendants is appropriate, Scola alternatively seeks an injunction against the continued use of her registered trademark LEXI LOVE to identify, promote, and commercialize Barnes's entertainment services, by both Barnes and Counter-Defendants Paramount and WOW. That is a narrowly tailored request to prevent ongoing trademark infringement, not a request to suppress expressive content.

If the Court declines to issue the broader injunction, Counter-Defendants can continue to stream Season 17 of Drag Race. They can continue to produce and distribute new content. They can continue to support Barnes's career. What they cannot do, at least not without Scola's permission, is continue to use Scola's registered trademark as the commercial identifier for a competing entertainer. Courts regularly issue precisely this kind of relief in trademark cases, and it has never been treated as a prior restraint. Counter-Defendants' continued use of the Mark in their streaming platforms would be, of course, at their own peril, in the event that Scola prevails on her claims. But the more limited alternative relief requested would at least stop the continuing harm inflicted on Scola through global promotion of Barnes infringing her Mark.

### B. The Equities Favor the Senior Rights Holder

As stated above, the Ninth Circuit has recognized that the reverse confusion doctrine protects senior users from being overwhelmed in the marketplace by the commercial dominance of a junior user. See *Dreamwerks*, 142 F.3d at 1129–30. Courts sitting in equity regularly protect the senior user's investment in her mark, even where doing so imposes some adjustment cost on the junior user. See *Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178,

1198 (C.D. Cal. 2013) (granting preliminary injunction to protect senior trademark rights despite potential economic impact on defendant). Scola is the senior user. The marks are identical. The field of use is identical. The documented harm is substantial. Counter-Defendants, by contrast, are not meaningfully prejudiced by being required to use Barnes's legal name or an alternative stage name in their promotional materials, an adjustment that would have been trivial to make at the outset and remains feasible now.

### C. The Public Interest Supports Protecting a Valid Trademark

The public interest argument cuts sharply against Counter-Defendants. The Lanham Act's core purpose is to prevent consumer confusion and protect the distinctiveness of marks that signal source identity. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1065 (9th Cir. 1999); *Yuga Labs, Inc. v. Ripps,* 144 F.4th 1137 (9th Cir. 2025.) Granting an injunction that stops the ongoing use of Scola's registered mark by a competing entertainer advances that purpose directly. It tells the marketplace who "Lexi Love" is, and it allows consumers to make accurate attributions. Counter-Defendants' invocation of the prior restraint doctrine simply does not withstand analysis. A trademark injunction that prevents use of a specific commercial identifier by a specific competitor is not a prior restraint on speech, and instead is a standard exercise of the Court's equitable authority to protect intellectual property rights. The requested relief is often granted to protect the intellectual property owner in such instances. See, e.g., *Yuga Labs, supra,* 144 F.4th at 1137.

### VII.    PERFORMER IDENTITY IS A PROTECTABLE COMMERCIAL INTEREST

Counter-Defendants' Opposition repeatedly attempts to minimize the significance of the name "Lexi Love" by characterizing it as merely a stage name used within an expressive context. That argument is contrary to well-established law recognizing that a performer's name and identity function as protectable commercial interests under the Lanham Act and related doctrines.

The Ninth Circuit has long recognized that a performer's identity, including name, voice, and persona, serves as a commercial identifier capable of protection against confusing or unauthorized use. In *Waits v. Frito-Lay, Inc*. 978 F.2d 1093, 1100 (9th Cir. 1992) (abrogated on other grounds by *Lexmark Intern., Inc. v. Static Control Components, Inc*., 572 U.S. 118 (2014)),

13

the court held that the unauthorized imitation of a distinctive voice could give rise to liability because it misled consumers into believing that the performer was associated with the product. *Id.*. Similarly, in *Midler v. Ford Motor Co.* 849 F.2d 460, 463 (9th Cir. 1988), the court found liability where a sound-alike singer created the false impression of association with Bette Midler, emphasizing that a performer's identity has independent commercial value.

Courts have long recognized that a performer's name, likeness, and identity carry significant commercial value and are protected against unauthorized exploitation. See *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996). Courts have likewise recognized that stage names and performance identities can function as protectable marks where they identify the source of entertainment services. See *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013). These principles apply with even greater force in this classic reverse confusion case. See *Dreamwerks,* 142 F.3d at 1130; *Surfvivor*, 406 F.3d at 630. These authorities reflect the broader principle that the law protects the commercial identity of performers from confusing or misleading use in commerce, particularly where such use suggests endorsement, affiliation, or association.

The Ninth Circuit's decision in *Abdul-Jabbar v. General Motors Corp,.* 85 F.3d 407, 413 (9th Cir. 1996) confirms that a name itself can function as a protected commercial identity. There, the use of Kareem Abdul-Jabbar's former name in a commercial context was sufficient to create liability because it suggested endorsement or association. The same reasoning applies here. The use of the identical name "Lexi Love" in connection with entertainment services creates a powerful and immediate association in the minds of consumers, particularly where both parties operate in the same field.

Courts addressing disputes among performers have likewise recognized that stage names and performance identities are entitled to trademark protection. In *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.,* 736 F.3d 1239 (9th Cir. 2013), the Ninth Circuit affirmed injunctive relief preventing unauthorized use of "The Platters" name, recognizing that such names represent the goodwill and identity of the performer. Similarly, in *Commodores Entertainment Corp. v. McClary,* 879 F.3d 1114 (11th Cir. 2018), the Eleventh Circuit held that

14

even a founding member could not continue to use a band name in a manner that created confusion as to source. These cases underscore that performer identity is not a free-floating expressive concept, but instead it is a commercial asset subject to trademark protection.

Plaintiff's attempt to characterize her use of "Lexi Love" as purely expressive ignores the commercial reality of modern entertainment. A performer's name is the primary vehicle through which audiences identify, search for, and engage with that performer. It is used in marketing, promotion, ticket sales, streaming platforms, and social media. As the Supreme Court emphasized in *Jack Daniel's*, when a defendant uses a mark as a mark, that is, as a designation of source, the First Amendment does not displace traditional trademark analysis. *Id.* at 157. Here, Scola's continued use of her stage name 'Lexi Love' across online and social media platforms underscores the confusion caused by Barnes's use, particularly after its amplification through the Drag Race platform. Plaintiff's use of "Lexi Love" is not incidental to an expressive work. It is the very name under which she offers and promotes her services. That use directly competes with and conflicts with Scola's longstanding use of the identical name. The resulting confusion is not abstract or theoretical, it is concrete and documented in the record. (Scola Decl. ¶¶ 21–25.)

This case, therefore, falls squarely within the line of authority recognizing that performer identity is protectable and that unauthorized use of that identity, particularly through identical naming, creates actionable confusion. If anything, the use of an identical name presents an even stronger case for protection. *See Sunearth, Inc. v Sun Earth Solar Power Co., LTD*, 846 F.Supp. 1063 (N.D. Cal. 2012) (granting preliminary injunction based on the *Sleekcraft* factors including identical names causing confusion.) Allowing Plaintiff to continue using the identical name would not merely permit artistic expression; it would sanction the displacement of Scola's commercial identity in the marketplace. The Lanham Act does not permit such a result. To the contrary, it exists to prevent precisely this type of confusion and misappropriation.

## VIII.    CONCLUSION

For these reasons, and those set forth in the Motion, the Court should recognize that Scola's identity as "Lexi Love" is a protectable commercial interest and that Plaintiff's use of the identical name in the same field constitutes willful infringement warranting injunctive relief.

15

Dated: March 30, 2026

/s/ Reid Winthrop

Reid A. Winthrop
WINTHROP LAW GROUP, P.C.
Attorney for Selena Scola

DEFENDANT/COUNTER-PLAINTIFF SELENA SCOLA'S REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION